17758

STANDARD REGISTER COMPANY, Appellant, v. D. C. KERRIGAN and Southern Systems & Forms, Respondents

(119 S. E. (2d) 533)

*Messrs. Turner, Wells, Granzow & Spayd,* of Dayton, Ohio, and *Leatherwood, Walker, Todd & Mann,* of Greenville, *for Appellant,*

*Messrs. Haynsworth, Perry, Bryant, Marion & Johnstone,* of Greenville, *for Respondents,*

*Messrs. Turner, Wells, Granzow & Spayd,* of Dayton, Ohio, and *Leatherwood, Walker, Todd & Mann,* of Greenville, *for Appellant, in Reply.*

March 22, 1961.

Moss, Justice.

The Standard Register Company, the appellant herein, brought an equitable action in the Court below, seeking to restrain and enjoin a former employee, D. C. Kerrigan, the respondent herein, from violating a restrictive covenant contained in a contract of employment. The appellant sought a permanent injunction restraining the named respondent from competing, directly or indirectly, with it, in selling to eighteen certain accounts in the Greenville area of South Carolina, formerly assigned to the respondent while he was employed as a sales representative of business forms and equipment for the appellant. The appellant also asks for an injunction to enjoin and restrain the respondent, Southern Systems & Forms, Inc., from interfering with the contractual relationship existing between the appellant and Kerri-

gan. This appeal is from an order of the Trial Court refusing to grant such injunction.

The appellant is a corporation existing under the laws of the State of Ohio, and is engaged in the business of the manufacturing and sale of business forms, systems, accesories and devices. It appears that in the year 1940 the appellant employed Kerrigan, who was then nineteen years of age, as a stenographer. Since that time he has been continuously in the employ of the appellant in one capacity or another, in various sections of the country, with the exception of approximately three and one-half years that he spent in the army, until he voluntarily terminated his employment with the appellant on May 1, 1959. At the time respondent terminated his employment, he was, and had been, a sales representative of the appellant in Greenville, South Carolina, since July, 1955.

It appears that the appellant and the respondent did, on August 3, 1953, enter into a written agreement or employment contract, whereby the respondent was employed as a sales representative by the appellant, upon the terms and conditions set forth therein, which said contract provided, *inter alia,* that:

"(a) The sales representative shall be paid a remuneration as specified in the applicable provisions contained in Standard's Sales Operation Manual and as specified in Sales Department Memoranda furnished the sales representatives from time to time.

"(b) The sales representative will, from time to time, be assigned products of the Company to sell, and a territory or accounts within a territory; and, when so assigned, the sales representative agrees to confine his activities on behalf of the Company to said products and to said territory or accounts. * * *

"(c) * * * The sales representative further agrees, for a period of two years after leaving the employment of the Company, that he will not engage, directly or indirectly, in

competition with said Company in selling to the accounts or in the territory in which he has been performing his duties as such sales representative. * * *

"(d) This agreement shall be considered an Ohio contract and construed according to the laws of Ohio."

Immediately upon the termination of Kerrigan's employment with the appellant, he incorporated Southern Systems & Forms, Inc. with its principal office in Greenville, South Carolina, of which he is president and general manager. Kerrigan and his wife own one-half of the stock of the corporation and are members of its board of directors. The other stockholders and members of the board are J. C. and Jack Keys. It is admitted that this corporation is engaged in the business of manufacturing and selling business forms and devices, comparable to those sold by the appellant.

It was stipulated by the parties to this action that Kerrigan had contacted all but one of the eighteen accounts set forth in the complaint, for the purpose of making or promoting sales to such accounts by Southern Systems & Forms, Inc. It was further stipulated that some sales were made by Kerrigan for the benefit of his new company, to some of these accounts, subsequent to the termination of his employment with the appellant. It is admitted that after Kerrigan terminated his employment with the appellant that the eighteen accounts mentioned in the complaint were advised that he was going into business for himself.

The question for determination on this appeal is whether the Trial Judge committed error in refusing to enforce, by injunction, the restrictive covenant contained in the contract of employment made by Kerrigan with the appellant.

According to the early common law of England, an agreement in restraint of a man's right to exercise his trade or calling was void as against public policy. In those days, a man could not lawfully exercise a trade to which he had not been fully apprenticed, and one so admitted was obliged by statute to follow and exercise his

trade. Hence, to enforce such an agreement was to deny such person the right to earn his living and to require him to violate an express provision of the law. While the law in this respect has undergone changes, as it exists today, numerous limitations have been engrafted on the early rule. Thus, such an agreement or covenant may be enforceable where it is ancillary to a lawful contract and necessary to the protection of the covenantee. As stated by some authorities, in order that the agreement may be enforced, it must appear that insofar as it affects the right of the parties thereto, the contract is reasonable, and that it is consistent with the interests of the public. 36 Am. Jur., Monopolies, Section 50, page 530.

In the case of *Welcome Wagon, Inc. v. Morris,* 4 Cir., 224 F. (2d) 693, 698, it was said:

"Such contracts were regarded with high disfavor under the old common law. And they are so regarded, in general, by modern courts, though apparently with some amelioration of the ancient disfavor. Modern courts have usually, in passing on these contracts, employed three criteria: (1) Is the restraint, from the standpoint of the employer, reasonable in the sense that it is no greater than is necessary to protect the employer in some legitimate business interest? (2) From the standpoint of the employee, is the restraint reasonable in the sense that it is not unduly harsh and oppressive in curtailing his legitimate efforts to earn a livelihood? (3) Is the restraint reasonable from the standpoint of a sound public policy?"

The essential question here concerns the enforceability of a contract admittedly in partial restraint of trade. The employer and the employee have stipulated that this question is to be determined by the law of Ohio. Our inquiry must be directed to the decisions of the court of that State, dealing with the subject of contracts in partial restraint of trade or competition. The following Ohio cases have been called to our attention. They are: *Briggs v.*

*Butler,* 140. Ohio St. 499, 45 N. E. (2d) 757; *Toulmin v. Becker,* Ohio App., 124 N. E. (2d) 778; *Conforming Matrix Corp. v. Faber,* 104 Ohio App. 8, 146 N. E. (2d) 447; *Arthur Murray Dance Studios of Cleveland, Inc. v. Witter,* Ohio Com. Pl., 105 N. E. (2d) 685; *Red Star Yeast & Products Co. v. Hague,* 25 Ohio App. 100, 157 N. E. 393; *Federal Sanitation Co. v. Frankel,* 34 Ohio App. 331, 171 N. E. 339; *Harry Livingstone, Inc. v. Stern,* 69 Ohio App. 105, 43 N. E. (2d) 302.

In the case of *Briggs v. Butler, supra,* it appeared that one Charlotte Butler entered into a contract with Thomas W. Briggs, who operated a Welcome Wagon Service, and in the contract of employment she agreed that for a period of five years, after the termination of her employment she would not engage in the same kind or similar business in competition with Briggs in Toledo, Ohio, or in any other place where Briggs was rendering his service. The employee resigned from her position with the Welcome Wagon Service and entered the employment of Toledo New Comers Service Company, and there performed the same work as she had previously performed for Briggs. The action was one to restrain her from engaging in or conducting a similar business for her new employer in the restricted area referred to in her contract with Briggs. The answer of the employee challenged the validity of the restrictive covenant in her contract with Briggs and resisted its enforcement. The lower Court of Ohio had refused to enforce the restrictive covenant and the Supreme Court of Ohio, in reversing such holding, granted an injunction on the ground that the restrictive covenant of the employment contract did not impose a restraint beyond that reasonably required for the protection of Briggs. It was further held that the provision in the contract of Butler with Briggs was not unreasonably restrictive upon her rights and did not contravene public policy. We quote from the opinion of the Court:

"It is stated in 17 Corpus Juris Secundum, Contracts, p. 636, § 254, that 'it is the rule in the absence of contrary stat-

ute that agreements by which an employee as part of his contract of employment undertakes not to enter into a competing business on leaving his employer's service are sustained if they are no wider than reasonably necessary for the protection of the employer's business, and do not impose undue hardship on the employee, due regard being had to the interests of the public.'

"The determination of the necessity for such restriction is dependent upon the nature and extent of the business and the nature and extent of the service of the employee in connection therewith and other pertinent conditions.

"Many cases are cited in the text which involve the application of this rule wherein it is quite generally held that contracts whereby salesmen, agents, canvassers and other employees who come into personal contact with their employer's customers agree not to engage in a competing business within a limited time or area after leaving their employer's service are valid and enforceable; contracts of restricted employment which are deemed invalid are those which impose a restraint held to be wider than reasonably required for the protection of the employer's business, or unreasonably restrictive upon the rights of the employee, or in contravention of the public interest. The cases involving contracts containing covenants restricting subsequent employment are almost limitless in number and are cited in annotations in 9 A. L. R. 1456; 20 A. L. R. 861; 29 A. L. R. 1331; 52 A. L. R. 1362; 67 A. L. R. 1002, and 98 A. L. R. 963.

\* \* \*

"A business is built upon the confidence of its customers and the employee gains acquaintances and sells the customers by using the good will of the employer. The employer's dealings with his customers through the employee gives the employee confidential knowledge that should not be divulged or used for his own benefit. It is by reason of this personal, if not confidential, relationship which the parties sustain that contracts to protect the employer by restriction of subsequent

employment within reasonable limits of time and of space are permitted and sanctioned, and equity will enjoin the employee from competing in violation of his covenant.

\* \* \*

"It is to be observed that the restrictive provisions of the contract relate only to 'the same kind or similar business, in competition with the company in Toledo,' etc., and do not undertake otherwise to prevent or limit the trade, occupation, profession, business or activities of the defendant. The clear purpose and effect of the contract is to prevent or at least to limit the appropriation of the benefits of information and experience secured in her service with the plaintiff and the employment thereof for her own personal advantage and to the disadvantage of the plaintiff by becoming a direct competitor, as in fact did occur in this instance." [140 Ohio St. 499, 45 N. E. (2d) 761.]

The case of *Arthur Murray Dance Studios of Cleveland v. Witter, supra,* was an action to enjoin the violation of a negative covenant restricting post employment, as was contained in an employment contract. Judge Hoover, the author of the opinion, in picturesque language, sets forth the facts involved, as follows [105 N. E. (2d) 687]:

"When the defendant, Clifford Witter, a dance instructor, waltzed out of the employment of the plaintiff, the Arthur Murray Dance Studios of Cleveland, Inc., into the employment of the Fred Astaire Dancing Studios, the plaintiff waltzed Witter into court. For brevity, the two studios are called 'Arthur Murray' and 'Fred Astaire'. At the time Witter took his contentious step, Arthur Murray had a string attached to him—a certain contract prohibiting Witter, after working for Arthur Murray no more, from working for a competitor. That Arthur Murray and Fred Astaire are rivals in dispensing Terpsichorean erudition is not disputed. Now Arthur Murray wants the court to pull that string and yank Witter out of Fred Astaire's pedagogical pavilion."

In the *Arthur Murray Dance Studios case,* the court refused to enjoin Witter from working for the Astaire Dancing Studios. The basis for such holding is as follows:

"Just as one has to consider the difference between tossing a tiger or a pet cat into a cage with a human being, so here, in determining whether an ex-employee is a threatening menace, one has to consider the very nature of the actor. A milkman is usually a customer-procuring, business-getting type. That's his purpose and design. Inherently he becomes a highly dangerous deflector of business. In *Briggs v. Butler,* 140 Ohio St. 499, 506, 45 N. E. (2d) 757, consider how the customer-procuring business-getting ex-employee was beginning to tear the roof off the very house she had built for employer. A milkman, being the type he is, turn him loose on behalf of a rival in the small area where he's been operating and you know what's going to happen. That's why some of the cases say that the employer may enjoin the ex-employee from working along his old route just as soon as the ex-employee starts working there for a rival, and that the employer does not have to wait until the ex-employee starts picking off his old customers. He doesn't have to wait for the inevitable. Irreparable injury is impending and threatening. By sharp contrast, Witter is not in the customer-procuring business. He's the plant worker type. Arthur Murray was not able to show that Witter had approached, solicited or deflected one Arthur Murray pupil, or that he had such a hold that one pupil on the pupil's own initiative, followed Witter. Twice Witter was on the stand and Arthur Murray did not even cross examine him about it. If Witter had been such a magnet the best proof would have been to show that he was actually attracting away his old pupils. If he had been doing that, surely Arthur Murray would have been just as resourceful to detect and prove it as countless other litigious employers. Unlike the milkman working his old route for a rival, Witter has not been out among the haunts of his old pupils. The two are too frequent to be just coincidental—*i. e.*—the finding of definite proof of the ex-

employee soliciting and deflecting his old customers in cases where injunctions are granted relying on 'customer hold'— such as *Briggs v. Butler,* 140 Ohio St. 499, 506, 45 N. E. (2d) 757, and *Worrie v. Boze,* 191 Va. 916, 917, 928, 62 S. E. (2d) 876 (An Arthur Murray Case). If Witter were pursuing a studied plan of soliciting and deflecting his old pupils this would be a different case."

It is clearly indicated in the above quotation that if Witter had been following the practice of soliciting and deflecting students of Arthur Murray, that an injunction would have been granted.

A covenant restricting the activities of an employee, after the termination of his employment, in order to be valid and enforceable, must be partial or restrictive in its operation, either as to time or place, on some good consideration, and must be reasonable, that is, it should afford only a fair protection to the interests of the party in whose favor it is made. Here, Kerrigan is restricted for a period of two years after leaving the employment of the appellant, from engaging, directly or indirectly, in competition with the said appellant in selling "to the accounts or in the territory in which he has been performing his duties as such sales representative." It is an admitted fact that during the year 1958 and that portion of the year 1959, while Kerrigan was a sales representative for the appellant, he was limited to eighteen assigned accounts. It is an admitted fact that Kerrigan personally contacted all but one of these eighteen assigned accounts for the purpose of making sales for his new corporation, Southern Systems & Forms, Inc., and he, in fact, succeeded in making sales to a majority of these accounts of products competitive with those of the appellant. It was a part of Kerrigan's agreement with appellant that when accounts within a given territory were assigned to him as sales representative, he would confine his activities on behalf of the appellant to such accounts.

The general rule is that restraint as to territory, in order to be reasonable, must be necessary in its full extent for the protection of some legitimate interest of the employer. Stated negatively, the territorial scope renders the restraint unreasonable if it covers an area broader than necessary to protect the legitimate interest of the employer. It has been said that the most important single asset of most businesses is their stock of customers. Protection of this asset against appropriation by an employee is recognized as a legitimate interest of the employer. A restrictive covenant, therefore, is reasonable if it is designed to protect the employer against loss of his customers. Hence, if the employer can show a need of protection against unfair appropriation of his customers by his employee, the negative restrictive covenant is reasonable as to the employer.

The principle of customer-contact protection finds its expression in the general rule that the territorial restraint in a covenant not to compete will, generally speaking, be considered reasonable if the area covered by the restraint is limited to the territory in which the employee was able, during the term of his employment, to establish contact with his employer's customers. 43 A. L. R. (2d) pages 151 and 162. There is cited in support of the foregoing statement two Ohio cases. *Federal Sanitation Co. v. Frankel,* 34 Ohio App. 331, 171 N. E. 339; and *Toulmin v. Becker,* Ohio App., 124 N. E. (2d) 778. In the *Frankel case* it appears that a disinfectant salesman was given exclusive selling rights in all Catholic schools and institutions in Ohio and Michigan, and in the cities of Erie, Pennsylvania, and Louisville, Kentucky. In his contract of employment he agreed that he would not, for a period of twelve months after the termination of his contract of employment with the plaintiff, engage in the same kind of business, nor act in aid of the business of any competitor within the boundaries of the territories assigned. The Court stated that the nature of the employment was such as to bring the employee in personal contact with the patrons and customers of the employer. We quote from the opinion the following [34 Ohio App. 331, 171 N. E. 340]:

"It is clear that if the nature of the employment is such as will bring the employee in personal contact with the patrons or customers of the employer, or enable him to acquire valuable information as to the nature and character of the business and the names and requirements of the patrons or customers, enabling him, by engaging in a competing business in his own behalf, or for another, to take advantage of such knowledge of or acquaintance with the patrons or customers of his former employer, and thereby gain an unfair advantage, equity will interfere in behalf of the employer and restrain the breach of a negative covenant not to engage in such competing business."

The Ohio Court then, upon the question of the reasonableness of the restriction as to territory, pointed out that the agreement only restrained the employee from soliciting or transacting business with the Catholic schools and institutions, leaving him at liberty to transact business with all institutions not under Catholic control in the states of Ohio and Michigan, and with all the world outside of those two States.

The second of the elements comprising the concept of reasonableness, as applied to the territorial scope of a covenant not to compete ancillary to a contract of employment, is reasonableness as to the employee. The general rule is that the restraint as to territory, in order to be reasonable, must not be unduly harsh and oppressive on the employee. Kerrigan contends that the covenant in his contract is unreasonably harsh and oppressive. The most important single factor entering into the determination of the reasonableness as to the employee of the territorial extent of the restraint, is its economic consequences to the employee. The limitation as to the territory, in a restrictive covenant not to compete, is unreasonable in the sense that it is unduly harsh and oppressive when the contract tends to deprive the employee the opportunity of supporting himself and his family.

Kerrigan is married and has three children, and such was his family situation at the time he signed the contract with the appellant. The evidence shows that Kerrigan, while employed by the appellant, had an income of $10,501.98 in the year 1956; his income in 1957 was $11,868.86; in 1958 his income was $12,126.46, and for the first four months of 1959, which was immediately prior to the termination, by Kerrigan, of his employment with the appellant, he had a total income of $7,376.26. He, of course, had expenses of travel in connection with his work as sales representative of the appellant, which would necessarily reduce his net income.

Under the economic hardship theory, which makes a restrictive covenant unreasonable as to the employee, the Court can take into consideration adverse general business conditions, possible deprivation of the support for the employee and his family, and necessity that employee change his calling or residence. A careful review of the evidence fails to show the applicability of any of these elements adversely affecting Kerrigan because of the restrictive covenant in his contract of employment with the appellant. There is a lack of evidence on the part of Kerrigan to show that he has been adversely affected by the restrictive covenant. There is no testimony as to what the income of Kerrigan is from Southern Systems & Forms, Inc. He testified that he was president and chief executive officer of his new corporation. This corporation has a branch in Charlotte, staffed with three salesman, and there are a like number of salesmen in the Greenville office, with additional part time salesmen and a clerical staff. Kerrigan also testified that his new company has had phenomenal growth and acceptance in the Carolinas, and it also planned to build a major business forms manufacturing plant in the Carolinas. It thus appears that no economic hardship has been imposed upon Kerrigan, by reason of the restrictive covenant. He is free to utilize his many years of training and experience with the appellant to sell many hundreds of established customers of the appellant in the Greenville area, other than the eighteen assigned ac-

counts; to sell all other customers of business forms and devices, and to sell noncompetitive products to the eighteen assigned accounts, and to act in an administrative and executive capacity with Southern Systems & Forms, Inc. In view of the undisputed facts in the record, we do not think that the restrictive covenant was unduly harsh and oppressive upon Kerrigan.

We think the restrictive covenant not to compete, limited in duration to two years after leaving the employment of the appellant, was reasonable. The two-year limitation has been held to be reasonable in a number of cases. These are collected in an annotation in 41 A. L. R. (2d) beginning at page 179, to which reference is here had. See also *Delmar Studios of the Carolinas v. Kinsey,* 233 S. C. 313, 104 S. E. (2d) 338, which directs attention to several North Carolina cases on the subject. In this case the restriction of two years is no more than was necessary to afford a fair protection to the appellant, and it was not oppressive to Kerrigan.

The third element comprising the concept of reasonableness as applied to a time limitation in a restrictive covenant, not to engage in a competitive business ancillary to a contract of employment, is reasonableness as to the general public. It is the general rule that the restraint as to time, in order to be reasonable, must not be injurious to the public. The time limitation renders restraint unreasonable if the period of time is so long as to interfere with the interest of the general public by depriving it of the employee's industry and service. The evidence shows that the sale of business forms in the Greenville area is highly competitive. There are a number of organizations, according to the testimony, selling the same commodities to the public. The fact that Kerrigan's skill and ability, as a sales representative, for the duration of two years cannot be utilized for selling to the eighteen assigned accounts, does not violate the interest of the general public, since, as is heretofore stated, there is no shortage of Kerrigan's type of service, or the products which he sells. *Briggs v. Butler, supra;*

*May v. Young,* 125 Conn. 1, 2 A. (2d) 385, 119 A. L. R. 1445; *Lakeside Oil Company v. Slutsky,* 8 Wis. (2d) 157, 98 N. W. (2d) 415.

The appellant asserts that the Trial Judge was in error in holding that the covenant not to compete, which was a part of the contract of employment, was contrary to the public policy of this State. The contract in question, with the negative restrictive covenant therein, is not contrary to the public policy of the State of Ohio. *Briggs v. Butler, supra.*

The contract with which we are here concerned provides that it shall be construed according to the law of the State of Ohio, but if it is invalid under the law of the State where it is to be performed and contrary to our public policy, we will not enforce it. *Davis v. Jointless Fire Brick Co.,* 9 Cir., 300 F. 1. In the case of *Wiggins v. Postal Telegraph Co.,* 130 S. C. 292, 125 S. E. 568, 569, 44 A. L. R. 781, this Court said:

"We know of no principle of law based upon comity or interstate commerce transactions, which would require a state court to recognize the validity of a contract which under its laws is declared to be against public policy, immoral and void. *(Building & Loan) Association [Columbian] v. Rice,* 68 S. C. (236), 241, 47 S. E. 63; 2 Kent, Comm., 458; *Thornton v. Dean,* 19 S. C. (583), 587, 45 Am. Rep., 796; 3 A. & E. Enc. Law., 561."

In the case of *Grant v. Butt,* 198 S. C. 298, 17 S. E. (2d) 689, 693, this Court said:

"It seems to be well established in this State that contracts having for their object anything that is obnoxious to the principles of the common law, or contrary to statutory enactments or constitutional provisions, or repugnant to justice and morality, are void; and that the Courts of this State will not lend aid to the enforcement of contracts that are in violation of law or opposed to sound public policy. *Magwood v. Duggan,* 1 Hill, 182; *Craig v. U. S. Health & Accident Ins.*

*Co.,* 80 S. C. 151, 61 S. E. 423, 18 L. R. A., N. S., 106, 128 Am. St. Rep., 877, 15 Ann. Cas., 216."

In the case of *Reeves v. Sargeant,* 200 S. C. 494, 21 S. E. (2d) 184, 186, this Court said:

"* * * It is well settled that while contracts in general restraint of trade are against public policy and void, yet those in partial restraint, founded upon a valid consideration and reasonable in their operation, are valid and binding. *Metts v. Wenberg,* 158 S. C. 411, 155 S. E. 734. The test which generally is laid down by which it may be determined whether a contract is reasonable is whether it affords a fair protection for the interests of the party in whose favor it is made, without being so large in its operation as to interfere with the interest of the public. 17 C. J. S. Contracts § 240, p. 623, 36 Am. Jur., section 52, page 533, and cases cited."

The reason that contracts against competition are ██ held to be unenforceable unless they meet certain criteria, is that they constitute a restraint upon trade which is against public policy. *Somerset v. Reyner,* 233 S. C. 324, 104 S. E. (2d) 344. In the case of *South Carolina Finance Corporation of Anderson v. Westside Finance Co. et al.,* 236 S. C. 109, 113 S. E. (2d) 329, 334, we said:

"A covenant not to compete is enforceable if it is not detrimental to the public interest, is ancillary to the sale of a business or profession, is reasonably limited as to time and territory, and is supported by a valuable consideration. 36 Am. Jur., Monopolies, Combinations, and Restraints of Trade, Sections 52, 53, 54, 55, 56; *Metts v. Wenberg,* 158 S. C. 411, 155 S. E. 734; *Reeves v. Sargeant,* 200 S. C. 494, 21 S. E. (2d) 184; *Somerset v. Reyner,* 233 S. C. 324, 104 S. E. (2d) 344."

We think the restrictive covenant not to compete limited to the eighteen assigned accounts, and limited in duration to two years, was reasonable as to the employer, the employee and the public, and hence, the provision is not contrary to

the public policy of this State. The failure of the Trial Judge to so hold was error.

The final question for determination is whether the Trial Judge committed error in finding that the covenant not to compete was without sufficient consideration.

It is well settled that a restrictive covenant not to engage in a competitive business ancillary to a contract of employment, will be upheld and enforced if, *inter alia,* it is supported by a valuable consideration. *Federal Sanitation Co. v. Frankel,* 34 Ohio App. 331, 171 N. E. 339; *McCluer v. Super Maid Cookware Corp.,* 10 Cir., 62 F. (2d) 426; *Wisconsin Ice & Coal Co. v. Lueth,* 213 Wis. 42, 250 N. W. 819. Cf. *Reeves v. Sargeant,* 200 S. C. 494, 21 S. E. (2d) 184; *Somerset v. Reyner,* 233 S. C. 324, 104 S. E. (2d) 344; *South Carolina Finance Corporation of Anderson v. Westside Finance Co. et al.,* 236 S. C. 109, 113 S. E. (2d) 329.

The testimony of Kerrigan shows that immediately prior to the signing of the contract here in question, he was in the employ of the appellant, doing clerical work in Dayton, Ohio. Kerrigan's own testimony thereabout is as follows:

"Q. After Dayton, doing clerical job in Dayton, what did you do then? A. I was given an offer to come to New York in the capacity of special accounts salesman.

Q. Did you go? A. Yes, sir.

Q. Then, you went back to New York as a salesman? A. That is right.

Q. How long did you stay there? A. I stayed there from August, 1953 until July, late July, 1955.

Q. Now, at the time you went there in August of 1953, as a condition of your going into that job, did they require you to sign this agreement? A. That is correct.

Q. Referred to as plaintiff's exhibit one? A. Yes, sir.

Q. Would you have gone to work with them in New York without that agreement? A. They would not have kept me on the job if I had not signed the agreement.

Q. It was a condition of your employment? A. That is correct."

In the case of *Shayne of Miami, Inc. v. Greybow, Inc.*, 232 S. C. 161, 101 S. E. (2d) 486, 489, we said:

"An age-old definition of consideration is, 'a benefit to the party promising, or a loss or detriment to the party to whom the promise is made.' 17 C. J. S., Contracts, § 70, p. 420. 'A long series of decisions has established the rule that a benefit to the promisor or a detriment to the promisee is sufficient consideration for a contract.' 12 Am. Jur. 570, Contracts, Sec. 79. For the last quoted text there are cited in the footnote our leading cases of *Ferrell v. Scott*, 2 Speers 344, 42 Am. Dec. 371, and *Furman University v. Waller*, 124 S. C. 68, 117 S. E. 356, 33 A. L. R. 615."

In the case of *Evatt v. Campbell*, 234 S. C. 1, 106 S. E. (2d) 447, we quoted with approval the definition above set forth in the *Shayne of Miami case*, and we likewise held that mutual promises also constitute good consideration. In the North Carolina case of *Kadis v. Britt*, 224 N. C. 154, 29 S. E. (2d) 543, 152 A. L. R. 405, it was held that ordinarily employment is a sufficient consideration to support a restrictive negative covenant, but where the employment contract is supported by purported consideration of continued employment, and containing covenants of employee, who occupied subordinate position of deliveryman and bill collector, not to disclose any business affairs of employer and not to enter employment of any competitor within a designated territory for two years after termination of employment, was without consideration where contract was exacted after several years employment and employee's duties and position were left unchanged. Applying the rule of this case to the situation in the instant case, we find that even though Kerrigan had been in the employ of the appellant for a number of years, his position and duties were changed when he signed the contract. He became a spécial accounts salesman in New York rather than fulfilling the

duties of a clerical job in Dayton, Ohio. He says himself that the appellant would not have kept him on the job if he had not signed the agreement. The signing of the agreement by Kerrigan changed his contractual relationship with the appellant. This was a benefit to Kerrigan and was a valuable consideration moving to him.

In the case of *Roessler v. Burwell,* 119 Conn. 289, 176 A. 126, it was held that there was adequate consideration for the negative covenant by the defendant in a contract of employment, where the underlying purpose of the defendant in entering into the agreement was to continue in the employ of plaintiff, for whom he had been working prior thereto, the benefit offered the defendant being such continuance, in return for which plaintiff was to receive his services and the benefit of the restrictive covenant in the agreement, and the defendant actually received the benefit he sought in that he was continued in the employment more than four years after the agreement was made, until he voluntarily left it. Here, Kerrigan signed the agreement, thereby obtaining a promotion with the company, which he had the benefit of for some six years after the agreement was made. We think that the contract between the appellant and Kerrigan was supported by a valuable consideration. The failure of the Trial Judge to so hold was error.

Having reached the conclusion under the facts disclosed by this record that the restrictive covenant of the contract entered into by and between the appellant and Kerrigan, does not impose a restriction beyond that reasonably required for the protection of the appellant in his business, nor was such provision unreasonably restrictive upon the rights of Kerrigan or the public, and the contract being supported by a valuable consideration, it is valid and enforceable. Since it is undisputed that Kerrigan has and is violating the restrictive covenant, it was error on the part of the Trial Judge to refuse the injunction prayed for by the appellant.

Reversed.

TAYLOR, Acting C. J., LEGGE, J., and STEVE C. GRIFFITH and JAMES HUGH McFADDIN, Acting JJ., concur.